1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DIAMOND STATE INSURANCE COMPANY, and GREAT AMERICAN INSURANCE COMPANY,** ) ) ) | **1:10-CV-004  AWI JLT** |
| ) | |
| **Plaintiffs,** ) | **ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ORDER ON PLAINTIFFS' MOTIONS IN LIMINE, and ORDER ON DEFENDANT'S MOTION FOR CHANGE OF VENUE** |
| **v.** ) ) | |
| ) | |
| **DONALD LEE DEARDORFF, and DOES 1 through 10, inclusive,** ) ) | |
| ) | |
| **Defendants.** ) | (Doc. Nos. 39, 66-73) |

        This is a subrogation case that arises out of the death of six horses that were under the

care of Defendant Donald Deardorff ("Deardorff").  Plaintiffs Diamond State Insurance

Company ("Diamond") and Great American Insurance Company ("Great American") issued

insurance policies to the horses' respective owners.  Plaintiffs paid the owners for the loss of

their horses, and then brought this suit against Deardorff to recover the amounts paid to the

owners.  Plaintiffs allege claims for breach of contract, conversion, trespass to chattels, and

negligence.  Deardorff, a citizen of Oregon, removed this case from the Merced County Superior

Court on December 31, 2009.  The active complaint is the Second Amended Complaint ("SAC").

Deardorff now moves for summary judgment on all claims alleged against him.  For the reasons

that follow, Deardorff's motion will be granted and this case will close.

## FACTUAL BACKGROUND[1]

Deardorff is an extremely experienced horseman, with over 40 years of experience with training and boarding horses.  PUMF 16.  Deardorff's daughter, Allison Deardorff ("Allison"), also has had a successful professional equestrian career, even earning world championships, and has been a horse trainer for at least eight years.  PUMF 17.  Deardorff and his family have owned and operated a commercial stable in Molalla, Oregon, for almost 40 years.  DUMF 1.  The stable is operated as Deardorff Stable, LLC.  Id.  Deardorff advertises his stable's services in the back of breed publications and trade publications, and also has a website.  PUMF 24.  For horses boarded with Deardorff by clients, such as the horse owners in this case, Deardorff provides continuous (24/7) care wherever the horse may be.  DUMF 2.  The services offered by Deardorff in conjunction with boarding include providing a clean stall, food, water, training, transportation to and from horse shows, and care for the horses while at the show.  See Deardorff Dec. ¶ 3.[2] One of the reasons that clients board their horses with Deardorff is so that the clients may show their horses in horse shows across the country.  See Deardorff Dec. ¶ 4; cf. Lachman Depo. 90:11-91:1.  As part of the boarding contract, all of Deardorff Stable's clients agree to take on the risk that their horse might become sick, injured, or die while being boarded by Deardorff Stable. See Brooke Deardorff Dec. ¶ 4; Deardorff Dec. ¶ 17.  To make sure its clients are protected against the risk of loss of their horse while the horse is boarded with Deardorff, Deardorff Stable asks each client if they have mortality insurance for their horse.  See DUMF 17.  If a horse owner

---

[1] "DUMF" refers to "Defendant's Undisputed Material Fact," and "PUMF" refers to "Plaintiffs' Undisputed Material Fact."  Additionally, Defendant objects that portions of Exhibits I, L and M, contain inadmissable hearsay.  See Court's Docket Doc. No. 62.  The Court agrees and sustains these objections.  Finally, Plaintiffs raise multiple objections to the evidence that supports the DUMF's.  These objections are very numerous and generally too conclusory with little or no explanation.  To address each objection in detail would be unduly time consuming. Unless otherwise noted or explained in more detail, to the extent that the Court cites and relies on a DUMF or a particular piece of evidence, the Plaintiffs' objections to such DUMF or evidence are deemed overruled.

[2] Plaintiffs object that Paragraph 3 of Deardorff's declaration is irrelevant and misstates the evidence and the documents, which are the best evidence.  The objections are not persuasive.  First, there is an issue regarding the scope of the boarding services offered by Deardorff for purposes of the statute of limitations.  Paragraph 3 is manifestly relevant to that issue.  Second, it appears that Plaintiffs are making a "best evidence" objection under Rule of Evidence 1002.  However, there is no indication that Deardorff's declaration is trying to prove the contents of a written agreement or a document.  Instead, Deardorff describes the services included as part of his boarding relationship with his clients, and there is no evidence that Deardorff's boarding agreement with his clients is a written agreement.  There is insufficient evidence that Rule 1002 is applicable.  See Fed. R. Evid. 1002.

does not have mortality insurance for their horse, Deardorff Stable encourages the horse owner to obtain mortality insurance in case something happens to the horse.  Id.  If Deardorff Stable believed that a horse was under-insured, Deardorff Stable encouraged the horse owner to increase the insurance coverage to protect against the risk of loss.  Id.

Deardorff does not hold himself out to the public generally and indifferently to transport horses from place to place for profit.  DUMF 24.  In limited circumstances, Deardorff offers to transport horses for his clients and other trainers.  Id.  A Rate Schedule from Deardorff Stables dated April 1, 2008, has a section for "transportation."  See Plaintiffs' Ex. A.  The Rate Schedule indicates that transportation costs for a "Training Horse" to a "local" destination is $45.00, but to "other" destinations the charge is 45¢ per mile.  See id.  The costs for a "Non-Training Horse" is $50.00 for a "local" destination, and 50¢ per mile for "other" destinations.  See id.  Finally, the Rate Schedule indicates that distances over 500 miles one way are charged at 50¢ per mile.  See id.  The Rate Schedule is not made available to the general public, and transportation services have never been mentioned in any advertising by Deardorff or Deardorff Stables.  See Supplemental Deardorff Dec. ¶¶ 2-3.  The transportation services that are offered by Deardorff are within the scope and in furtherance of the boarding and training services he provides to his clients.  See DUMF 24; Supplemental Deardorff Dec. ¶ 4.

Leslie Pierce, Kelle Howard, Karen Lachman, Lisa Fulgaro, Colleen Gadbois, and Sally Nottage (collectively "the Horse Owners") boarded horses with Deardorff Stables and owned the particular horses that perished in this case.  Each of the Horse Owners purchased mortality insurance to protected against the loss of their horse while it was being boarded by Deardorff.  See Brooke Deardorff Dec. ¶ 5; DUMF 18.  Each of the Horse Owners, save for Kelle Howard, signed a power-of-attorney that indicated that their respective horses were in Deardorff's lawful possession.  DUMF 14.

Leslie Pierce, Kelle Howard, and Karen Lachman also signed a Waiver and Release from Liability as part of their relationship with Deardorff Stables.  See DUMF 21; Lachman Depo. 117:8-23; Pierce Deposition at 39:18-24.  The waiver reads in pertinent part:

I . . . am aware that riding, training, driving, showing, grooming or riding upon a

3

horse . . . are inherently risky and dangerous activities.  I am voluntarily participating in these activities with knowledge of these dangers.  As a condition of participation, I, on behalf of myself, my heirs, my successors and assigns, waive the right to bring an action or lawsuit against [Defendants], jointly, severally and individually, as well as their employees and agents, for injury or death arising out of these activities, whether it occurs on or off the property of the Stables.

. . . I . . . on behalf of myself, my heirs, my successors and assigns, in consideration of entering and remaining on the Stables' property, hereby release the Stables, jointly, severally, individually, as well as their employees and agents, from any and all claims which may arise out of the negligence of the Stables . . ., whether such conduct occurs on or off the property of the Stables.  I understand that I am waiving the right to bring an action for negligence for my injury or death.

I also understand that by signing this release from liability for negligence I waive the right to bring an action or lawsuit for damage to my property, and for harm or injury to my horse or pony, whether it is on or off of the property of the Stables. . . .

Oregon law shall govern in any claim or dispute relating to this Waiver and Release from Liability.

Defendant's Exs. 1, 2, 3.  Kelle Howard was not deposed in this case.  See Court's Docket Doc. No. 40 at 7 n.4.  Leslie Pierce testified in part that her understanding of the release was, "that if something happens to myself or my horse," including loss of her horse, she would not sue Deardorff.  Pierce Dep. 39:20-24; 73:22-74:6.  Karen Lachman testified in part that she understood that the waiver, in part, meant that "if your horse dies or gets sick, you're not going to sue," and, that when she signed the waiver, she agreed not sue Deardorff "for negligence on his part which caused damage to" the horse.  Lachman Depo. 86:7-87:1.

In the late spring of 2008, the Horse Owners decided that they wanted their respective horses to compete at the Santa Barbara National Horse Show.  See DUMF 3.  Deardorff agreed to transport the horses from Molalla to Santa Barbara and back for the horse show.  PUMF 3.  Once Deardorff decided he would attend the Santa Barbara show, as part of the boarding agreement between the horse owners and Deardorff, it was Deardorff's obligation to transport the horses to and from the Santa Barbara Show and provide 24/7 care, including feeding the horses.  DUMF 4.  The Owners paid Deardorff money for him to transport the horses from Molalla to Santa Barbara and back, which was in addition to the money paid to board the horses at Deardorff's stable in Molalla.  PUMF 4.

4

1    Deardorff and Allison transported the six horses from Molalla, Oregon, to Santa Barbara,

2    California, on June 29 and 30, 2008, helped the Horse Owners show their horses at the Santa

3    Barbara Show between July 2 and 5, 2008, and provided continuous care for the six horses.

4    DUMF 5.  Upon conclusion of the Santa Barbara Show, Deardorff and his daughter loaded the

5    six horses into their trailer and departed Santa Barbara to return to Molalla.  See DUMF 6.  For

6    the trip home, each horse was placed into a stall and provided access to a bag of hay to eat during

7    the trip.  DUMF 7.  Extra hay was also in the trailer.  See Allison Depo. 25:16-19.  Before

8    departing from Santa Barbara, Deardorff inspected the horses, the trailer (both inside and out),

9    the trailer's tires, and his truck.  DUMF 8.

10    Deardorff and Allison shared the driving until the John Erreca Rest Area located at

11    approximately Exit 386 on I-5, where they stopped to switch drivers again.  DUMF 9.  While at

12    the rest area, Deardorff visually inspected the horses, the trailer (both inside and out), the trailer's

13    tires, and his truck again.  See DUMF 10; Deardorff Depo. 38:18-39:16.  Deardorff was at the

14    rest area sometime between 4:00 and 4:30 a.m.  See DUMF 10; Allison Depo. 22:8-10.

15    Soon after departing the rest area, and while on I-5, a car pulled alongside Deardorff's

16    truck and signaled to Deardorff to look at the trailer as there was something wrong with it.  See

17    DUMF 11, PUMF 5.  After the other car signaled that something was wrong with the trailer,

18    Deardorff slowed down, and he and Allison saw intermittent sparks, but no flames, emanating

19    from the right rear side of the trailer close to the asphalt.  See PUMF's 6, 7; Deardorff Dec. ¶ 12.

20    Despite seeing the sparks coming from the trailer, knowing that something was wrong and

21    having at least one individual signal that there was a problem with the trailer, Deardorff did not

22    stop, but instead continued driving.  PUMF 8.  Deardorff was unsure what the problem was and

23    had many concerns about stopping on I-5's narrow shoulder in the dark.  See Deardorff Dec. ¶

24    14; Deardorff Depo. 40:12-41:4.  However, at some point, Deardorff pulled over to the side of I-

25    5 and looked into the horse trailer, at which time he saw "a lot of smoke coming out from the

26    inside of the trailer."  See  Plaintiffs' Ex. N.[3]  Deardorff began to panic, closed the door, and

27    _____

28    [3]The Court is referring to the police report of Officer Arpaia under the "Statements" section, which in part
purports to recount statements made by Deardorff.  See Plaintiffs' Ex. N.  However, the Court agrees with
Deardorff's objection that Exhibit N contains inadmissible hearsay.  The Court will consider Exhibit N only in the
redacted form that is attached to Deardorff's objections.  See Court's Docket Doc. No. 62.

began to drive north to get to a truck stop. See id.[4] As Deardorff drove, sparks continued to spray from the trailer, and at some point a fire started in the trailer. See PUMF 12; DRPUMF 12.[5]

Deardorff took the SR-152 exit from I-5. See Deardorff Dec. ¶ 15. Allison could not see any cars at the SR-152 exit. See PUMF 15; DRPUMF 15. As Deardorff exited I-5, a witness who had been following Deardorff, testified that there was a very limited fire on the back of the trailer, but the witness did not know if the Deardorffs were aware of the fire. See Lo Depo. 60:3-21. As the trailer slowed on the exit ramp, Deardorff saw a "fray of sparks and smoke" that appeared to be coming from the very back of the trailer. See Deardorff Dec. ¶ 15; Deardorff Depo. 42:22-43:4. In the midst of turning on the ramp, flames from the back became visible, and the flames grew in size and intensity. See Deardorff Depo. 43-:23-44:18; Allison Depo. 36:7-37:4; Deardorff Dec. ¶ 15; Allison Dec. ¶ 10. Instead of pulling over in a flat location just after the exit ramp, Deardorff drove an additional 2 miles to a Petro gas station/truck stop. See Deardorff Depo. 43:23-44:18, 45:4-17; PUMF 18. Deardorff drove as fast as he reasonably could to the Petro station. See Deardorff Dec. ¶ 15. Deardorff and Allison testified that they proceeded to the Petro station because the fire had reached such a size that they would need substantial help, including water, to contend with the flames. See Deardorff Depo. 44:12-18, 46:21-8; Allison Depo. 37:5-17. When Deardorff pulled into the Petro station, the trailer was engulfed with fire from the middle to the rear. See Deardorff Depo. 50:3-20; Plaintiffs' Ex. N. The trailer has doors on each side that are located in the middle and at the front of the trailer. See PUMF 19; DRPUMF 19. Allison opened one of the doors, got in the trailer, took a bucket of water that had been in the trailer, and threw it on some hay that was on the floor and that had caught on fire. See Allison Depo. 46:8-17. The bucket of water was not very successful in extinguishing the fire, and Allison continued to try to extinguish the fire with a fire extinguisher that someone from the Petro station had brought her. See id. at 46:17-24. Deardorff opened a

---

[4]There is a genuine dispute whether Deardorff stopped the trailer on I-5. Deardorff and Allison testified that they did not stop, but Exhibit N is to the contrary. It is not the Court's job to resolve this dispute. For purposes of this motion, the Court accepts Plaintiffs' version that Deardorff stopped on I-5. See Plaintiffs' Ex. N.

[5]"DRPUMF" refers to Defendant's Response to Plaintiffs' Undisputed Material Fact.

1   door on the other side of the trailer, entered the trailer, and attempted to save some of the horses.

2   See id.; Deardorff Depo. 47:13-48:12.  The Deardorffs were unsuccessful in their attempts to

3   save the horses, and all six horses died in the trailer fire on July 6, 2008, at approximately 5 a.m.

4   near the intersection of I-5 and SR-152.  See DUMF 12.  It appears that most of the horses had

5   died of smoke inhalation prior to the Deardorffs opening the trailer doors at the Petro station.

6   See Deardorff Depo. 47:13-48:12, 49:14-22; Allison Depo. 46:20-47:16.  Deardorff sustained

7   second degree burns on his face, arms, and hands as a result of going into the trailer to try and

8   save the horses.  See Deardorff Dec. ¶ 15.

9        The Horse Owners submitted claims to the Plaintiffs in July 2008.  DUMF 20.  Diamond

10   paid Leslie Pierce $100,000, paid Kelle Howard $50,000, and paid Karen Lachman $25,000 for

11   the loss of their horses.  See id.  Great American paid Lisa Fulgaro $25,000, paid Colleen

12   Gadbois $15,000, and paid Sally Nottage $11,000 for the loss of their horses.  See id.

13

14                        **SUMMARY JUDGMENT FRAMEWORK**

15        Summary judgment is appropriate when it is demonstrated that there exists no genuine

16   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

17   Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

18   American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

19   judgment bears the initial burden of informing the court of the basis for its motion and of

20   identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

21   absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

22   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

23   might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

24   Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

25   Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

26   sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson,

27   477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

28        Where the moving party will have the burden of proof on an issue at trial, the movant

7

must affirmatively demonstrate that no reasonable trier of fact could find other than for the

movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

element of the non-moving party's claim or by merely pointing out that there is an absence of

evidence to support an essential element of the non-moving party's claim.  See James River Ins.

Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire

& Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails

to carry its burden of production, then "the non-moving party has no obligation to produce

anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to

the opposing party to establish that a genuine issue as to any material fact actually exists.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210

F.3d 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its]

pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a

genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir.

2008) (quoting Fed. R. Civ. Pro. 56(e)).

        The evidence of the opposing party is to be believed, and all reasonable inferences that

may be drawn from the facts placed before the court must be drawn in favor of the opposing

party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad,

Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

and it is the opposing party's obligation to produce a factual predicate from which the inference

may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008);

UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

material fact does not spring into being simply because a litigant claims that one exists or

promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

"motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

1   'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

2   F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

3   circumstances to consider materials that are not properly brought to its attention, but the court is

4   not required to examine the entire file for evidence establishing a genuine issue of material fact

5   where the evidence is not set forth in the opposing papers with adequate references.  See

6   Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San

7   Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails

8   to produce evidence sufficient to create a genuine issue of material fact, the moving party is

9   entitled to summary judgment.  See Nissan Fire, 210 F.3d at 1103.

10

11                              **SUBROGATION FRAMEWORK**

12          "Subrogation is the substitution of another person in place of the creditor or claimant to

13   whose rights he or she succeeds in relation to the debt or claim."  Interstate Fire & Casualty Ins.

14   Co. v. Cleveland Wrecking Co., 182 Cal.App.4th 23, 31-32 (2010);  Fireman's Fund Ins. Co. v.

15   Maryland Casualty Co., 65 Cal.App.4th 1279, 1291 (1998).  In the context of insurance,

16   "subrogation takes the form of an insurer's right to be put in the position of the insured in order

17   to pursue recovery from third parties legally responsible to the insured for a loss which the

18   insurer has both insured and paid."  Interstate, 182 Cal.App.4th at 32; Great Am. Ins. Cos. v.

19   Gordon Trucking, Inc., 165 Cal.App.4th 445, 451 (2008); Fireman's Fund, 65 Cal.App.4th at

20   1291-92.  "[S]ubrogation rights are purely derivative," and thus "an insurer cannot acquire

21   anything by subrogation to which the insured has no right and can claim no right the insured does

22   not have."  Great Am., 165 Cal.App.4th at 451; United Servs. Auto. Ass'n v. Alaska Ins. Co., 94

23   Cal.App.4th 638, 645 (2001); see Fireman's Fund, 65 Cal.App.4th at 1292.   It is said that the

24   insurer as subrogee "stands in the shoes" of the insured/subrogor.  Interstate, 182 Cal.App.4th at

25   32; Great Am., 165 Cal.App.4th at 451; Fireman's Fund, 65 Cal.App.4th at 1292.  That is, a

26   subrogee "is put in all respects in the place of the party to whose right he is subrogated."

27   Employers Ins. of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1218 (9th Cir. 2003); Brown

28   v. Rouse, 125 Cal. 645, 650 (1899).  Because of the derivative nature of subrogation, the

subrogated insurer has no greater rights than the insured, and the insurer is subject to the same defenses assertable against the insured.  See Liberty Mut. Ins. Co. v. Fales, 8 Cal.3d 712, 717 (1973); Interstate, 182 Cal.App.4th at 32; Great Am., 165 Cal.App.4th at 451; Fireman's Fund, 65 Cal.App.4th 1292.  Thus, "a subrogee insurer is subject to the same statute of limitations that would have been applicable had the insured brought suit in his or her own behalf." Employers, 330 F.3d at 1218; Great Am. W., Inc. v. Safeco Ins., 226 Cal. App. 3d 1145, 1152 (1991); see Great Am., 165 Cal.App.4th at 451.   Further, under certain circumstances, a subrogated insurer will be bound by the statements and admissions of the insured.  Great Am., 165 Cal.App.4th at 452; H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter Group 2010) § 9:138.15 ("Croskey").  "When the insured makes affirmative statements or admissions about the facts of his claim, particularly those facts within the insured's own knowledge, it may be appropriate to hold that the subrogated insurer is bound by those statements or admissions, because they define the insured's claim and the insurer stands in the insured's shoes in the subrogation action."  Great Am., 165 Cal.App.4th at 452; Croskey at § 9:138.15.

### DEFENDANTS' MOTION

1.      Punitive Damages & Emotional Distress

        Plaintiffs state that, consistent with their discovery responses, they are not pursuing either punitive damages or emotional distress damages.  See Opposition at 20:8-9.  California law forbids assignment of punitive and emotional distress damages.  Murphy v. Allstate Ins. Co., 17 Cal.3d 937, 942 (1976).  Summary judgment on these damages, which were requested in the SAC, is appropriate.  Murphy, 17 Cal.3d at 942; Opposition at 20:8-9.

2.      Statute of Limitations

        *Defendant's Argument*

        Deardorff argues that all of Plaintiffs' claims are time barred by the one year statute of limitations of California Code of Civil Procedure § 340(c) (hereinafter "§ 340(c)").  Deardorff

1    was boarding the horses at the time of the incident on July 6, 2008.  The Horse Owners

2    themselves testified that Deardorff was boarding the horses at the time of the incident.  The

3    horses died as a result of alleged negligent conduct by Deardorff.  Because the basis of the claims

4    are from the neglectful conduct of Deardorff, it does not matter that non-negligence causes of

5    action are alleged.  Each claim comes under the one year limitations period.

6        *Plaintiffs' Opposition*

7        Plaintiffs argue that their claims are not time barred.  First, the language of § 340(c) states

8    that the section applies to those who board or feed animals, and applies to the injury or death of

9    an animal in the course of boarding or feeding.  There is no language that states that the section

10   applies in the course of a person's transport of an animal.  Because the legislature did not include

11   the term transport, then injuries that occur during an animal's transportation is not included.

12   Second, all of the Horse Owners testified that boarding included shelter, food, and water for the

13   horse, as well as general oversight.  However, Karen Lachman testified that transportation was an

14   additional charge that was not included in the price of boarding the horse.  Deardorff's own Rate

15   Schedule confirms that transportation is not included as part of boarding a horse.  The Rate

16   Schedule sets rates for a number of separate and distinct services, including "board and training,"

17   "board only," "board and exercise," and "transportation."  If "boarding" included transportation

18   as Deardorff contends, there would be no reason to list out the rates for these two services

19   separately, since the transportation services would be subsumed.  Third, § 340(c) by its own

20   terms are limited to negligence causes of action only.  As such, even if § 340(c) is applicable,

21   that section would not apply to the causes of action for breach of contract, conversion, and

22   trespass to chattels.

23       *Legal Standard*

24       "A plaintiff must bring a claim within the limitations period after accrual of the cause of

25   action."  Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 806 (2005).  Generally, a claim or

26   cause of action "accrues at the time when the cause of action is complete with all of its

27   elements."  Pineda v. Bank of Am., N.A., 50 Cal.4th 1389, 1397 (2010); Fox, 35 Cal.4th at 806.

28   The particular statute of limitations "to be applied is determined by the nature of the right sued

1  upon, not by the form of the action or the relief demanded." <u>Day v. Greene</u>, 59 Cal.2d 404, 411

2  (1963); <u>Parker v. Walker</u>, 5 Cal.App.4th 1173, 1189 (1992).  "Neither the caption, form, nor

3  prayer of the complaint will be deemed conclusive in determining the nature of the liability from

4  which the cause of action flows," but instead "the true nature of the action will be ascertained

5  from the basic facts *a posteriori*." <u>Estate of Young</u>, 160 Cal.App.4th 62, 77 (2008); <u>Rivas v.</u>

6  <u>Safety-Kleen Corp.</u>, 98 Cal.App.4th 218, 229 (2002); <u>Walker</u>, 5 Cal.App.4th at 1189; <u>H. Russell</u>

7  <u>Taylor's Fire Prevention Service, Inc. v. Coca Cola Bottling Corp.</u>, 99 Cal.App.3d 711, 717

8  (1979).  For certain claims against individuals who board or feed animals, there is a one year

9  limitations period in which to bring suit.  <u>See</u> Cal. Code Civ. Pro. § 340(c).  Specifically, the

10  California Code of Civil Procedure provides in pertinent part:

11      Within one year . . . An action . . . against any person who boards or feeds an
        animal or fowl or who engages in the practice of veterinary medicine. . . for that
12      person's neglect resulting in injury or death to an animal or fowl in the course of
        boarding or feeding the animal or fowl or in the course of the practice of
13      veterinary medicine on that animal or fowl.

14  Cal. Code. Civ. Pro. § 340(c).

15  "While resolution of the statute of limitations issue is normally a question of fact, where the

16  uncontradicted facts established through discovery are susceptible of only one legitimate

17  inference, summary judgment is proper." <u>Romano v. Rockwell Internat.</u>, 14 Cal.4th 479, 487

18  (1996); <u>Jolly v. Eli Lilly & Co</u>, 44 Cal.3d 1103, 1112 (1988).  If the facts are susceptible to

19  opposing inferences, the statute of limitations is a question for the trier of fact.  <u>See</u> <u>Cleveland v.</u>

20  <u>Internet Specialties West, Inc.</u>, 171 Cal.App.4th 24, 31 (2009); <u>Ralph Andrews Productions, Inc.</u>

21  <u>v. Paramount Pictures Corp.</u>, 222 Cal.App.3d 676, 682 (1990).

22      *Discussion*

23      a.    Applicability of § 340(c) in General

24      The key issue with respect to the statute of limitations is:  was Deardorff in the course of

25  boarding the horses, or instead was he simply transporting the horses.  Plaintiffs rely on

26  Deardorff's Rate Schedule and testimony from the Horse Owners to argue that transportation is

27  something that is separate and apart from boarding.

28      With respect to the Rate Schedule, that document has the following sections: Board and

12

1   Training, Board Only, Board and Exercise, Lesson, Halter Show Fee, Halter Breaking Free, Full

2   Body Clip, Transportation, Horse Show Day Charge, Travel Expenses (for Don Deardorff),

3   Equipment Rental, Fine Harness Buggy Rental, Harness Rental, Jog Cart Rental, Horse Show,

4   Sales, or Photo Prep, and Tailnicking After Care. See Plaintiffs' Ex. A. As discussed above, the

5   Rate Schedule breaks down "transportation" based on training or non-training horses, and local

6   or other destinations. See id. Plaintiffs are correct that the Rate Schedule indicates that the fees

7   for boarding are separate from the fees for transportation. See id. However, that separate fees

8   are charged for these activities does not end the inquiry.

9         Deardorff declared that his boarding services include a clean stall, food, water, training,

10  transportation to and from shows, and care for the horse while at the show. See Deardorff Dec. ¶

11  3. Deardorff declared that one of the primary businesses of the Stable is to board, train, and help

12  clients show their horses. See id. at ¶ 19. Deardorff also declared that one reason that clients

13  board their horses with him is that the clients are then able to show their horses across the

14  country. See id. at ¶ 4. Deardorff declared that the boarding agreement obligated him to

15  transport the horses in this case to Santa Barbara (once Deardorff decided to attend) and back,

16  and to continue to provide 24/7 care to the horses while in transit, including food and water. See

17  id. Deardorff declared that the limited transportation services that he offers are within the scope

18  and in furtherance of his business of boarding, training, and showing horses. See id. at ¶ 19.

19         Deardorff's declaration therefore indicates that transporting horses is an aspect of the

20  boarding services that he offers at the Stable, and that the transportation service is of a limited

21  nature. That is, the transportation services are primarily for taking horses to and from horse

22  shows. There is nothing that indicates that each client must show their horse at a show. Rather,

23  the declaration, when read in combination with the Rate Schedule, indicates that clients have

24  choices. Once a client chooses to attend a horse show, then transportation costs, as well as show

25  costs, are assessed. See Lachman Depo. 15:7-16-18. However, Deardorff never stops caring for,

26  boarding, or feeding the horse. Transportation appears to be a necessary aspect of attending

27  shows, which is part of the services offered through the boarding relationship.

28         To counter the position that transportation services are an aspect of the boarding services

or boarding relationship, Plaintiffs also rely on the deposition testimony of the Horse Owners. However, as a subrogation case, the Plaintiffs stand in the shoes of their insureds and are bound by certain admissions of their insureds.  Testimony and admissions regarding the nature of any agreements or the nature of the relationship with Deardorff would be included in the category of binding admissions.  Great Am., 165 Cal.App.4th at 451-52; Croskey § 9:138.15.  This is because it is the individual insureds who entered into the relationship/agreement with Deardorff, not the Plaintiffs.  It is the insureds'/Horse Owners' intent and their understanding that formed the agreement and relationship with Deardorff, not the Plaintiffs.  It would be improper to allow Plaintiffs to advocate a position that is contrary to the actual relationship or agreement with Deardorff as shown through the insureds/Horse Owners.  Great Am., 165 Cal.App.4th at 451-52; Croskey § 9:138.15.  Because the Plaintiffs are bound by certain admissions, any arguments by the Plaintiffs that are contrary to binding admissions by their insureds are proscribed.

Colleen Gadbois testified that going to a show was not included in the "monthly boarding," and instead there was a "show fee," extra fees associated with the show, and "the registration and the transport and the food and the care while they're at the show."  Gadbois Depo. 48:6-14.  However, Gadbois also testified that, in connection with the shows, the horses "still get the 24/7 care, they still get the exercise, they still get training."  Id. at 48:14-19. Gadbois also testified that, "Deardorff . . . did board [her horse] from the time [it] was at Deardorff Stable up until and including the time of the accident."  Id. at 66:20-24; see also 64:17-21.  Gadbois also confirmed that Deardorff provides 24/7 boarding and feeding.  Id. at 65:9-12. Gadbois also testified that any agreement between herself and Deardorff regarding the Santa Barbara show "would include much more than just transporting the horses to and from Molalla, Oregon . . .," and "would include boarding and feeding the horse."  Id. at 70:4-12.  Great American is bound by Gadbois's admissions that her horse was boarded by Deardorff 24/7, i.e. 24 hours a day seven days a week, that the agreement regarding the Santa Barbara Show included boarding and feeding, and that the horse was boarded up to and including the time of the accident.  See Great Am., 165 Cal.App.4th at 451-52; Croskey § 9:138.15.

Karen Lachman testified that, every year, Deardorff would send a rate schedule and a

14

show schedule; a client would pay certain show fees ahead of time and then pay travel fees later. See Lachman Depo. 15:7-16-18.[6]  Lachman also described the services included for "board" under the Rate Schedule, and the description did not include "transportation."  See id. at 100:14-101:8.  Lachman testified that she had the option whether to enter her horse in a show, and if she "entered [her horse] into the stables, that Mr. Deardorff would arrange for the transportation of [the horse] to the show" and back again, and that she would compensate Deardorff for the transportation cost on a per-mile basis. Id. at 90:14-91:1.  However, Lachman also testified that Deardorff provided boarding services for her horse "prior to and at the time of [the horse's] death." Id. at 101:9-11.  Of particular note, Lachman testified that, prior to loading the horse on the trailer, she had "reached an agreement with Mr. Deardorff concerning [her horse's] attendance at [Santa Barbara]," that Deardorff "would transport the horse to and from Santa Barbara," and that Deardorff "would provide all boarding services for the horse, *in transport and at the show.*" Id. at 105:3-24 (emphasis added).  Diamond is bound by Lachman's admission that her horse was being boarded prior to and including the time of the accident, and that the agreement to take her horse to Santa Barbara included provision of boarding services while in transport. Great Am., 165 Cal.App.4th at 451-52; Croskey § 9:138.15.

Lisa Fulgaro testified that "boarding costs" at Deardorff Stable included the stall, bedding, and feeding, but that taking a horse to a show was not included "under board." See Fulgaro Depo. 18:1-17.  Fulgaro testified that horse shows represented additional charges, and that some of the charges that were incurred when her horse went to a show included hauling fees, day fees, and Deardorff's personal expenses. See id. at 19:14-22.  However, Fulgaro also testified that Deardorff was responsible for "boarding [the horses] around the clock" while they were in his possession, and that Deardorff "did board [her horse] at the time of the incident," including feeding the horse. Id. at48:6-4, 50:7-11.  Fulgaro also testified that, when she told Deardorff that she wanted to go to the Santa Barbara show, that meant that she wanted her horse to attend and that would include Deardorff transporting the horse, boarding the horse at the show,

---

[6]Lachman also testified that, entry fees and funds were requested by and returned to Brooke Deardorff, who is Deardorff's wife, and Brooke would send the appropriate funds to the horse shows for the owners. See Lachman Depo. 14:22-15:2.

and "include [Deardorff] boarding the horse and feeding the horse during transport." <u>Id.</u> at
52:19-53:8. Great American is bound by Fulgaro's admission that Deardorff boarded her horse
around the clock, including the time of the incident, and that her request to take her horse to
Santa Barbara included transportation and food and board during transport. <u>Great Am.</u>, 165
Cal.App.4th at 451-52; Croskey § 9:138.15.

Sally Nottage testified that feeding, cleaning the stall, training and exercise were included
as "board." <u>See</u> Nottage Depo. 21:22-22:10. However, Nottage also testified that Deardorff was
responsible for boarding her horse up to and including the time of the accident, and that
Deardorff was feeding her horse "at the time of the accident" because she "was still paying board
in addition to the show costs." <u>Id.</u> at 57:12-23, 58:18-20. Nottage testified that "Deardorff did
board [the horse] at the time of the accident." <u>Id.</u> at 59:2-4. Finally, Nottage testified that, when
she decided to attend the show, that included Deardorff "taking the horse from Molalla down to
Santa Barbara and boarding it the entire time," and that the decision was not limited to just
driving the horse to Santa Barbara and back. <u>Id.</u> at 60:24-61:7. Great American is bound by
Nottage's testimony that Deardorff boarded the horse at the time of the accident and was feeding
the horse at the time of the accident, that attendance at the Santa Barbara show included
Deardorff taking the horse and boarding it the entire time, and that the agreement with Deardorff
was not limited to transportation. <u>Great Am.</u>, 165 Cal.App.4th at 451-52; Croskey § 9:138.15.

Leslie Pierce testified that boarding horses at Deardorff Stable includes stall cleaning,
feeding, training, care, and general maintenance. <u>See</u> Pierce Depo. 27:11-20. Pierce testified
that an extra fee, as opposed to the monthly fee, was charged for attendance at horse shows. <u>See</u>
<u>id.</u> at 29:23-24:9. Pierce testified that transportation to the shows was billed as "transportation,"
was normally billed per mile, and was added to the monthly bill as an itemized expense. <u>See id.</u>
30:23-31:7. However, Pierce also testified that the hauling fee is "generally standard" because
the "barn" that she uses now also charges "a hauling fee." <u>See id.</u> at 31:4-11. Pierce testified
that she was aware of no separate agreements between herself and Deardorff for transporting the
horses to and from shows. <u>See id.</u> at 60:5-16. Pierce testified that Deardorff boarded the horse
up to and including the time of the accident, Deardorff was responsible for boarding the horse at

1    all times, and Deardorff was responsible for feeding the horse at the time of the accident.  See

2    id. at 66:1-25.  Finally, Pierce testified that her relationship with Deardorff was not limited to

3    hauling services because Deardorff "was also [her] trainer and care provider of [her] horse."  Id.

4    at 73:7-14.  Diamond is bound by Pierce's admissions that Deardorff was responsible for

5    boarding the horse at all times, including the time of the incident, that no separate agreement to

6    transport the horses existed, and that the agreement with Deardorff was not limited to hauling

7    services because Deardorff was the horse's care provider.  Great Am., 165 Cal.App.4th at 451-

8    52; Croskey § 9:138.15.

9        The Horse Owners' testimony is consistent with Deardorff's declaration, including

10   Deardorff's assertion that one reason clients board their horses with him is so that the clients and

11   their horses can attend national horse shows.  See Deardorff Dec. ¶¶ 3, 4.  Each of the Horse

12   Owners testified that Deardorff was responsible for providing 24/7 or around the clock care for

13   the horses.  The Horse Owners also confirmed that there is no separate hauling or transport

14   agreement between themselves and Deardorff.  The Horse Owners also confirmed that, when

15   they decided to attend the Santa Barbara show, they intended that Deardorff would continue to

16   board the horses 24/7, including during transport and at the show.  The Horse Owners also

17   confirmed that, at the time of the incident, Deardorff was boarding and feeding the horses.

18   Plaintiffs are bound by these admissions.  Great Am., 165 Cal.App.4th at 451-52; Croskey §

19   9:138.15.

20       What Plaintiffs have done is found a separate charge in the rate schedule for

21   transportation and have concluded that, if that charge applies, it means that none of the other

22   services offered by Deardorff apply.  The Horse Owners' testimony, as outlined above, show that

23   this is incorrect.  The testimony of the Horse Owners confirm that the transportation services are

24   part of the overall boarding relationship with Deardorff, and in particular part of their option to

25   attend horse shows.  Leslie Pierce also noted that such charges were typical and that the "barn"

26   where she currently has a horse also charges for hauling fees.  The idea that Deardorff is no

27   longer boarding a horse when he is in the process of transporting the horse leads to very strange

28   conclusions.  Essentially, just before the horses are on the trailer, Deardorff would be boarding

1   the horses; while the horses are feeding in the trailer and are in transit to and from a horse show,

2   Deardorff is not boarding the horse, but instead is strictly transporting the horse; but when they

3   arrive back at the stable, then Deardorff is once again boarding the horses.  So, in connection

4   with each show there would be a small period of time when Deardorff is no longer boarding the

5   horses, despite the boarding agreement's 24/7 care requirement never suspending.  This position

6   is contrary to Deardorff's obligation to provide around the clock care for the horses and the

7   Horse Owners' option to attend the horse shows with/through Deardorff.  None of the Horse

8   Owners' testimony supports Plaintiffs' position.  Plaintiffs read entirely too much into a Rate

9   Schedule, and ignore the admissions of their insureds.

10         Although it is true that there is a separate charge for transportation or hauling, the Horse

11   Owners' testimony confirms that they requested that Deardorff take and show the horses, that

12   Deardorff was still boarding the horses up to and including the time of the accident, there is no

13   separate agreement for only hauling the horses, and that they intended for Deardorff to provide

14   24/7 care and to board the horses during transit.  Plaintiffs' arguments to the contrary are

15   proscribed since they are bound by the admissions of their insureds.  <u>Great Am.</u>, 165 Cal.App.4th

16   at 451-52; Croskey § 9:138.15.  It is apparent that the horses were being transported in

17   connection with, and in furtherance of, being boarded by Deardorff.  Thus, they were injured

18   during the course of Deardorff boarding them.  The limitations period of § 340(c) applies.

19         <u>b.</u>      Applicability of § 340(c) to Particular Claims

20         Plaintiffs contend that, even if § 340(c) applies, their "non-negligence" causes of action

21   are unaffected.  The Court disagrees.

22         Plaintiffs are essentially relying on the titles of their causes of action to argue that §

23   340(c) is inapplicable.  However, the language of the statute does not state that it applies only to

24   a "negligence claim."  Instead, the statute states that "an action . . for that person's neglect

25   resulting in injury or death to an animal" must be brought within one year.  Cal. Code Civ. Pro. §

26   340(c).  The term "action" is broader than a single claim.  Instead, the California Code of Civil

27   Procedure defines the term "action" to mean "an ordinary *proceeding in a court* of justice by

28   which one party prosecutes another for the declaration, enforcement, or protection of a right, the

18

1  redress or prevention of a wrong, or the punishment of a public offense."  Cal. Code Civ. Pro. §

2  22 (emphasis added).  In other words, the term "action" does not refer to a particular tort, rather it

3  refers to a lawsuit to redress a wrong or to enforce a right or to punish an offense.  See id.

4  Moreover, it has long been established that the statute of limitations to be applied is determined

5  by the nature of the right sued upon and by an examination of the facts alleged, it is not

6  determined on the basis of captions, titles, forms or prayers.  See Day, 59 Cal.2d at 411; Estate of

7  Young, 160 Cal.App.4th at 77; Rivas, 98 Cal.App.4th at 229; Walker, 5 Cal.App.4th at 1189; H.

8  Russell, 99 Cal.App.3d at 717.  Whether § 340(c) applies to Plaintiffs' other "non-negligence"

9  entitled claims is determined by the underlying facts of the case.  See id.

10      In the SAC, Plaintiffs allege that Deardorff was signaled by a car, and when he looked

11  back, he saw flames, smoke, and sparks coming from the rear of the trailer.  See SAC ¶ 13.

12  Deardorff pulled over, opened the trailer door, and a lot of smoke came from inside the trailer.

13  See id. at ¶ 14.  Despite the fact that the trailer was smoking, Deardorff continued to drive on I-5

14  until he took the SR-152 exit.  See id. at ¶ 15.  Deardorff pulled over on SR-152 and saw that the

15  trailer was actually on fire.  See id. at ¶ 16.  Deardorff kept driving until he reached the Petro gas

16  station, but by the time he stopped, the trailer was fully engulfed by flames.  See id. at ¶ 17.

17  "[B]y the time Defendant finally attempted to get the horses out of his burning trailer at the

18  [Petro station], it was too late and all six horses . . . suffered fatal injuries as a direct result of the

19  fire."  Id. at ¶ 18.

20      Under each cause of action, all previous paragraphs are incorporated by reference.  See

21  id. at ¶¶ 21, 26, 36, and 42.  The first cause of action is for breach of oral contract and alleges that

22  Deardorff breached the contract by failing to safely transport the horses from Santa Barbara to

23  Oregon.  See id. at ¶ 23.  The second cause of action for negligence alleges that Deardorff

24  breached his duty of care when he continued to drive after learning that the trailer was smoking

25  and on fire, as well as when he failed to attempt to extinguish the fire in the trailer or remove the

26  horses from the burning trailer.  See id. at ¶¶ 30-31, 33.  The third cause of action for conversion

27  alleges that Deardorff destroyed the horses by intentionally leaving them in a trailer engulfed in

28  flames.  See id. at ¶ 38.  The fourth cause of action for trespass to chattels alleges that Deardorff

1   intentionally interfered with Plaintiffs' use or possession of the horses by intentionally leaving

2   them in a trailer that was engulfed in flames, which resulted in the horses' death.  See id. at ¶ 44.

3       The allegations in the SAC show that Plaintiffs are complaining about the death of the

4   horses, and they are contending that the deaths were a result of Deardorff's failure to stop, failure

5   to try to extinguish the fire, and/or failure to unload the horses.  Significantly, Plaintiffs expressly

6   allege that the failure to stop, the failure to attempt to extinguish the fire, and/or the failure to

7   unload the horses breached Deardorff's duty of care.  These actions are instances of "neglect,"

8   and they form the reason for any conversion, trespass, or failure to deliver.  The allegations in the

9   SAC make it clear that the basis of each of Plaintiffs' claims/individual causes of action is the

10  allegedly neglectful conduct of Deardorff.  This "action" is one for neglect by Deardorff while he

11  was in the course of boarding horses.  Thus, § 340(c) applies to Plaintiffs' breach of contract,

12  negligence, conversion, and trespass to chattels causes of action.  See Cal. Code Civ. Pro. §

13  340(c); Day, 59 Cal.2d at 411; Estate of Young, 160 Cal.App.4th at 77; Haverstock v. Hoge,

14  2003 Cal. App. Unpub. LEXIS 3359 (2003) (holding that § 340(c) barred claims for *inter alia*

15  negligence, intentional misrepresentation, and breach of oral agreement against a veterinarian for

16  injury occurring during the course of veterinary treatment);[7] Walker, 5 Cal.App.4th at 1189.

17      Because the evidence shows that Deardorff was in the course of boarding the horses at the

18  time of the incident, and because the facts show that each of the claims alleged in the SAC are

19  based on/tied to Deardorff's allegedly neglectful conduct, § 340(c) applies to the entirety of this

20  lawsuit.  Since the horses died in July 2008 and this case was filed on December 31, 2009, the

21  one year limitations period has run.  See Cal. Code Civ. Pro. § 340(c); Court's Docket Doc. No.

22  1.  Summary judgment on each claim on the basis of § 340(c) is appropriate.

23

24

25      [7]Plaintiffs state that consideration of *Haverstock* is inappropriate because it is an unpublished case that has
26  no precedential value and cannot be cited by California courts.  Plaintiffs state that Deardorff should be sanctioned
    under Rule 11 for citation to *Haverstock* and for failing to inform the Court that *Haverstock* is unpublished.  Rule 11
27  sanctions are inappropriate for a variety of reasons.  One reason is that the Court knew from the citation used by
    Deardorff that the case was unpublished.  The Court sees no intent to deceive.  Another reason is that this Court is
28  not bound by California's rule against citation to unpublished cases, and may consider reasoned unpublished cases as
    persuasive authority.  Employers Ins., 330 F.3d at 1220 n.8; Grant v. Aurora Loan Servs., 736 F.Supp.2d 1257, 1272
    n.53 (C.D. Cal. 2010); Roe v. Gustine Unified Sch. Dist., 678 F.Supp.2d 1008, 1042 n.29 (E.D. Cal. 2009).

3.     "Waiver" Provision[8]

*Defendant's Arguments*

Deardorff argues that Diamond's insureds, Leslie Pierce, Karen Lachman, and Kelle Howard, each signed releases that released Deardorff "from any and all claims" that may arise out of his negligence, no matter where the conduct occurs. The release also purports to waive lawsuits for "harm or injury" to the Horse Owners' horse or pony. The waiver's terms apply to the claims made by Diamond. Because Diamond stands in the shoes of its insureds, the releases bar all of Diamond's claims.

*Plaintiffs' Opposition*

The express language of the release does not extend to the death of the horses. The first two paragraphs of the release do not apply to injury or harm to the Horse Owners' horses or property. The first paragraph deals with injury due to inapplicable conduct, and the second paragraph applies to actions for negligence for the injury or death of the client/Horse Owner. Thus, these two paragraphs are not applicable to this case. The second paragraph is the paragraph that contains the language that Deardorff uses to argue that he has been released "from any and all claims" arising from negligence. The third paragraph is the one that relates to the actual horses, and that paragraph does not extend to the loss or death of the horses. Instead, the waiver applies to lawsuits for "harm or injury" to a horse. The use of "harm or injury" is significant because other parts of the release use the term "death." If the death of the horses was intended to be released or waived, then the release would have used the word "death."[9]

*Legal Standard*

Oregon courts follow three steps when interpreting contractual provisions. Wicker v. Oregon, 543 F.3d 1168, 1174 (9th Cir. 2008); Yogman v. Parrott, 937 P.2d 1019, 1021-23 (Or. 1997); Connall v. Felton, 201 P.2d 219, 223-24 (Or. Ct. App. 2009). First, courts examine the

---

[8] Although the ruling with regard to the statute of limitations is sufficient to end the case, as alternative holdings, the Court will address the other points raised by Deardorff in his summary judgment motion.

[9] Additionally, Plaintiffs argue that the release is ineffective against claims of gross negligence, and the facts of this case demonstrate gross negligence.

text of the disputed provision, in the context of the document as a whole, and if the provision is clear then the analysis ends.  Wicker, 543 F.3d at 1174; Yogman, 937 P.2d at 1021; Connall, 201 P.2d at 223.  Second, if the term is ambiguous, courts then examine extrinsic evidence with the goal of resolving the ambiguity.  Wicker, 543 F.3d at 1174; Yogman, 937 P.2d at 1022; Connall, 201 P.2d at 224.  A term is ambiguous if it is capable of more than one plausible and reasonable interpretation.  Connall, 201 P.2d at 223.  Third, if the extrinsic evidence does not resolve the ambiguity, courts resolve the contract's meaning by turning to applicable maxims of construction.  Wicker, 543 F.3d at 1174; Yogman, 937 P.2d at 1023; Connall, 201 P.2d at 224. The goal is to give effect to the parties' intentions.  Connall, 201 P.2d at 224.

"Agreements to exonerate a party from liability or to limit the extent of the party's liability for tortious conduct are not favorites of the courts but neither are they automatically voided.  The treatment courts accord such agreements depends upon the subject and terms of the agreement and the relationship of the parties."  K-Lines, Inc. v. Roberts Motor Co., 541 P.2d 1378, 1382 (Or. 1975); see also Mann v. Wetter, 785 P.2d 1064, 1066 (Or. Ct. App. 1990). However, "a party who seeks to avoid the enforcement of a contractual provision on the ground that the provision offends some general, uncodified public policy, must demonstrate that enforcement of that provision in the circumstances of his or her case will, in fact, offend that generalized public policy."  Harmon v. Mt. Hood Meadows, 932 P.2d 92, 96 (Or. Ct. App. 1997); see Silva v. Mt. Bachelor, Inc., 2008 U.S. Dist. LEXIS 55942, *6-*7 (D. Or. July 21, 2008).

*Discussion*

Plaintiffs argue that the death or loss of the horses is not included in the release.  The Court cannot accept Plaintiffs' arguments.[10]

This is a subrogation case, which as discussed above, means that Diamond stands in the shoes of its insureds and is bound by certain admissions made by their insureds.  Interstate, 182 Cal.App.4th at 32; Great Am., 165 Cal.App.4th at 451-52; Croskey § 9:138.15.  Here, Leslie

---

[10] The Court will address Plaintiffs' gross negligence claim in a separate section of this order, and focus instead in this section on Plaintiffs' contract construction argument.  As discussed below, there is insufficient evidence of gross negligence.

Pierce and Karen Lachman have acknowledged that the releases were intended to prohibit them from bringing a lawsuit against Deardorff in case of the loss or death of their horses.  See Pierce Depo. 39:18-24, 73:22-74:2; Lachman Depo. 86:7-87:6, 117:8-23.  It was Lachman and Pierce who signed the releases, not Diamond, and it is Lachman and Pierce's intent and understanding of the releases as the signatories/subrogees that matter.  Cf. Employers Ins., 330 F.3d at 1218; Great Am., 165 Cal.App.4th at 451.  Diamond makes arguments regarding the meaning of the release that are directly contrary to their insureds' understanding of, and intent behind, the releases.  This is improper.  Diamond is bound by Pierce and Lachman's testimony that the release covers the loss and/or death of the horses.  Great Am., 165 Cal.App.4th at 451-52; Croskey § 9:138.15.

Alternatively, it is a reasonable interpretation of the release that the death or loss of the horses is included.  The second paragraph states that the signatory releases Deardorff "from any and all claims which may arise out of the negligence of the Stables."  Defendant's Ex. 1.  There is no limit in this sentence.  The second paragraph continues to state that this includes the wrongful death of the signatory.  See id.  The third paragraph then begins that the signatory "also understands" that claims for injury or harm to the horse are excluded.  See id.  It is not unreasonable to conclude that these are just examples of the types of claims included under the broad umbrella of "all claims arising out of the negligence of the Stables."  Also, it would seem strange that the release would apply to every form of negligent injury to a horse except death.  As such, the plain text of the release does not as a matter of law exclude the death or loss of a horse.

At best, Diamond has shown an ambiguity in the policy which means that extrinsic evidence may be examined.  See Wicker, 543 F.3d at 1174; Yogman, 937 P.2d at 1022; Connall, 201 P.2d at 224.  Here, two of the Horse Owners testified that the release was meant to cover the loss or death of the horses.  See Pierce Depo. 39:18-24, 73:22-74:2; Lachman Depo. 86:7-87:6, 117:8-23.  Deardorff and his wife have declared that each of their clients (including the Horse Owners) agreed to "take on the risk" that the horses may get injured or die.[11]  See DUMF 17;

---

[11] The Court is not holding that the release is the actual assumption of the risk.  Instead, the Court views the release as consistent with an assumption of the risk by all clients.

Deardorff Dec. ¶ 17; Brooke Deardorff Dec. ¶ 4.  Deardorff's wife declared that each of their

clients are advised to obtain mortality insurance because of the clients' assumption of the risk.

See DUMF 17; Brooke Deardorff Dec. ¶ 4.  Finally, each of the Horse Owners obtained mortality

insurance.  See DUMF 18; Brooke Deardorff Dec. ¶ 5; SAC ¶¶ 8, 9.  Diamond has no contrary

evidence.  Therefore, the evidence shows that the intent behind the release is to release Deardorff

for the death or loss of a horse in his care that arises out of his negligence.

With respect to the scope of the release, as stated above the release covers "claims arising

out of the negligence" of Deardorff.  See Defendant's Ex. 1.  Oregon courts acknowledge that

"arising out of" is very broad language.  Clinical Research Inst. of S. Or., P.C. v. Kemper Ins.

Co., 84 P.3d 147, 151 (Or. Ct. App. 2003).  Generally, the term  "arising out of" is "broad and

requires only a causal connection, rather than a proximate causal connection," American Int'l

Specialty Lines Ins. Co. v. Kindercare Learning Ctr., 2011 U.S. Dist. LEXIS 28212, *20 (D. Or.

March 18, 2011); Ristine v. Hartford Ins. Co., 97 P.3d 1206 (2004), and "is understood to mean

originating from, incident to, or having connection with."  Clinical Research, 84 P.2d at 151;

Oakridge Comm. Ambulance v. U.S. Fidelity, 563 P.2d 164, 166 (1977).  This understanding is

consistent with the testimony of Pierce and Lachman.  Neither Pierce nor Lachman indicated that

the release applies only to causes of action that are entitled as "negligence."  Pierce Depo. 39:18-

24, 73:22-74:2; Lachman Depo. 86:7-87:6, 117:8-23.  As discussed above, each of the claims in

the SAC are based on the alleged neglect of Deardorff.  Because the causes of action for breach

of contract, conversion, trespass to chattels, and simple negligence arise out of allegedly

negligent conduct by Deardorff, each of these causes of action by Diamond are barred by the

release.

Summary judgment in favor of Deardorff is appropriate.

4.    Gross Negligence

*Defendant's Argument*

In his reply memorandum, Deardorff argues that the evidence does not establish gross

negligence.  There was not a safe place to release the horses, and no witness testified that this

was a legitimate option.  Although Deardorff intended to stop once he exited off of I-5 and onto

1    SR-152, the fire increased dramatically and he needed help to deal with the situation.  As for

2    extinguishing the fire, there was only one bucket of water in the trailer.

3         *Plaintiffs' Argument*

4         Diamond argues that it pled "gross negligence" under its negligence cause of action

5    because it alleged an extreme departure from the standard of care.  Releases cannot waive claims

6    of gross negligence.  The evidence in this case shows that Deardorff was grossly negligent, which

7    caused the death of the horses.  Deardorff was signaled by another car that there was a problem

8    with the trailer, but even after seeing intermittent sparks, he did not stop and instead kept driving.

9    Eventually Deardorff pulled to the side of the road and looked into the horse trailer.  Deardorff

10   saw a lot of smoke, but he did not attempt to extinguish the fire or unload the horses.  Instead,

11   Deardorff again kept driving.  When Deardorff finally exited I-5, small flames were coming out

12   of the back of the trailer.  There was a spot were Deardorff could have pulled over and either

13   unloaded the horses or extinguished the fire with the water that they had in the trailer.  Instead of

14   doing this, Deardorff incredulously continued to drive another two miles to the truck stop, even

15   though Deardorff and his daughter are experienced "horsemen."  By the time they reached the

16   truck stop, the fire was too far gone.  Deardorff had the opportunity to either preclude the fire or

17   save the horses, but he refused to do either.  This conduct constitutes gross negligence and cannot

18   be waived.

19        *Legal Standard*

20        "Gross negligence long has been defined in California and other jurisdictions as either a

21   'want of even scant care' or 'an extreme departure from the ordinary standard of conduct.'"  City

22   of Santa Barbara v. Superior Court, 41 Cal.4th 747, 754 (2007); Eastburn v. Regional Fire

23   Protection Authority, 31 Cal.4th 1175, 1185–86 (2003); cf. Fassett v. Santiam Loggers, Inc., 267

24   Ore. 505, 508 (1973) ("Gross negligence is the equivalent of reckless disregard and is negligence

25   of a substantially greater degree than that of ordinary negligence.").  "Gross negligence" connotes

26   "such a lack of care as may be presumed to indicate a passive and indifferent attitude toward

27   results."  Calvillo-Silva v. Home Grocery, 19 Cal.4th 714, 729 (1998).  Although generally

28   whether conduct constitutes "gross negligence" is a question of fact, a court may grant summary

1   judgment on the issue if the evidence does not reflect the distinction between "ordinary

2   negligence" and "gross negligence."  City of Santa Barbara, 41 Cal.4th at 766-67; Decker v. City

3   of Imperial Beach, 209 Cal. App. 3d 349, 358 (1989).

4       *Discussion*

5       Deardorff did not commit gross negligence in this case.  Plaintiffs contend that the death

6   of the horses was avoidable and lists three actions that they contend constituted gross negligence.

7       The first alleged instance of gross negligence is that Deardorff did not stop the trailer on

8   I-5 when a car signaled him and he noticed intermittent sparks coming from right side of the

9   trailer.  See PUMF 8; Plaintiffs' Opposition at 11:4-8.  However, Deardorff testified:

10      Q:      And Could you tell what the sparks were from?

11      **A:      No.  That was the perplexing part.  I was examining – in my mind I was
12              trying to decide what the possibilities were, whether it was actual sparks as
                in fire or maybe a chain dragging or something, but something was causing it
13              intermittent.  It would be a spray of little sparks close to the asphalt and then
                nothing and then they'd reappear.**

14      Q:      Did you give any thought to stopping at that point and just pulling off on the side
                of the road?
15
16      **A:      My first thought was besides examining possibilities, there was an exit a near
                distance from us and my first thought was, "There's something wrong.  Get
17              to that exit before I stop."  Because it's pretty uncomfortable to stop your rig
                right on the freeway, especially when we're talking about the livestock.  So
18              the plan was – my immediate plan was I'm going to go to that exit and
                examine the situation.**

19  Deardorff Depo. 40:12-41:4.  There is no evidence that Deardorff's concern over stopping on I-5

20  was inappropriate.  In fact, Leslie Pierce testified that she drove the same stretch of I-5 and that

21  there is either no shoulder or "a real narrow shoulder."  Pierce Depo. 114:11-115:5.  Further,

22  there is no evidence that the exit was not "near."  It is clear that Deardorff was considering what

23  might be causing the sparks and acknowledged that there was a problem.  To address the

24  problem, Deardorff wanted to get to an exit to stop because he did not feel comfortable stopping

25  the livestock trailer (which was filled with six show horses) on a stretch of I-5 where there is

26  little or no shoulder.  Plaintiffs acknowledge that Deardorff is an experienced horseman with

27  over 40 years experience.  See PUMF 16.  Plaintiffs acknowledge, and Deardorff's declaration

28  indicates, that he has experience hauling horses.  See PUMF 23; Deardorff Dec. ¶¶ 3, 4, 5.  There

is no evidence from any person who has experience hauling show horses that stopping on that stretch of I-5 was advisable.  Nor is there evidence regarding the distance from the location where Deardorff saw sparks to the SR-152 exit.  Given the uncontradicted thought process of Deardorff, his experience with horses and his experience hauling horses, the evidence that the SR-152 exit was "near," the confirmation from Leslie Pierce that there is little or no shoulder in which to pull over,[12] and the absence of evidence from persons with experience hauling show horses to contradict Deardorff's concerns, the evidence might at best suggest negligence, but it does not reflect gross negligence.  In light of the evidence presented, no reasonable jury could find that Deardorff's failure to pull over right away shows "the want of scant care or an extreme departure from the standard of care."

        The second alleged instance of gross negligence is that, when Deardorff pulled over on I-5, he did not attempt to extinguish the fire or unload the horses.  See PUMF 9; Plaintiffs' Opposition at 11:8-12.  The police report indicates that when Deardorff stopped on I-5 and looked into the trailer,"a lot of smoke came from the trailer," which caused Deardorff to panic and to decide that he needed to drive to the truck stop.  See Plaintiffs' Ex. N.  However, there is no evidence that unloading the horses on I-5 at between 4:00 to 4:30 a.m. was even arguably advisable.  Lee Lo, who was in a car that had followed Deardorff to the SR-152 exit, and Leslie Pierce who drove that same stretch of I-5, both commented about this option.  Both Lo and Pierce thought that the possibility of unloading the horses created too great a danger that the horses would get loose and cause an even greater accident on I-5.  See Lo Depo. 61:21-62:25; Pierce Depo. 114:11-115:13, 116:14-117:17.  Pierce confirmed that saddleback horses, like the horses in this case, are more high strung, and that their instincts are either fight or flight.  Pierce Depo. 116:14-117:17.  Pierce confirmed that Deardorff would know about the high strung nature of these horses and that these horses would likely run, especially her own horse.  See id.  Officer Arpaia confirmed that there was barbed wire along the sides of this stretch of I-5.  See Arpaia Depo. 97:3-17.  Combined with Pierce's prior testimony that there was little to no shoulder on

---

[12]Leslie Pierce testified that she drove that same stretch of I-5.  She thus has knowledge of the area and of the fact, and her statement binds Diamond.

that stretch of I-5, as well as with Deardorff's concern over stopping with a trailer full of show
horses/livestock, there is nothing to suggest that unloading these high strung horses at that time
of day on that stretch of road was a viable or responsible option.  With respect to not attempting
to extinguish the fire with the water that was in the trailer, the only evidence about water is that
the Deardorffs carried water, but that there was only one bucket full of water available.  <u>See</u>
Allison Deardorff Depo. 25:20-23, 46:13-20.  The evidence is also to the effect that there was "a
lot of smoke" coming from the trailer, so much so that it caused Deardorff to panic.  <u>See</u>
Plaintiffs' Ex. N.  Given the quantity of smoke, there is no evidence that the single bucket of
water would have stopped the fire.  Deardorff believed that he needed to keep driving to reach
the truck stop.  <u>See id.</u>  The evidence is uncontradicted that Deardorff viewed the truck stop as a
place to obtain help.  While there were other options available to Deardorff, he chose the option
of attempting to get to a place where he could obtain more help.  Again, while this evidence at
best might suggest negligence, it does not show gross negligence.  No reasonable jury could find
that Deardorff's decision to drive for help instead of either unloading the horses on I-5 or using
the single bucket of water to try to extinguish a fire that was causing "a lot of smoke" and a panic
reaction shows "the want of scant care or an extreme departure from the standard of care."

Finally, Plaintiffs contend that Deardorff was grossly negligent when, at the time he took
the SR-152 exit, he did not stop and attempt to unload the horses or extinguish the fire, which
was limited to the back of the trailer.  <u>See</u> PUMF 18; Opposition at 11:18-28.  Lee Lo testified
that there was a limited fire at the back of the trailer as Deardorff exited.  <u>See</u> Lo Depo. 60:3-21.
However, Lee Lo did not take the SR-152 exit, but instead kept driving on I-5.  <u>See id.</u> at 17:16-
20.  The only evidence regarding the fire after Deardorff pulled onto the SR-152 exit ramp and
began to slow down is that "a great fray of sparks and smoke" flew up from the trailer, which
caused Deardorff to conclude that he needed to get off of the freeway entirely.  <u>See</u> Deardorff
Depo. 43:9-44:2.  Deardorff continued to pull around the loop of the exit and prepared to stop at
a flat, safe area.  <u>See id.</u> at 44:3-9.  As Deardorff slowed down on the loop, he saw flames
explode from the trailer.  <u>See id.</u> at 44:10-18.  At some point on the exit loop, Allison saw "high
flames" that were several feet in size coming from the trailer.  <u>See</u> Allison Depo. 36:7-37:4.

1    Upon seeing the size of the flames, both Deardorff and Allison concluded that the problem was

2    well beyond them and that they needed to get help.  See Deardorff Depo. 44:17-45:10; Allison

3    Depo. 37:8-17, 40:8-11.  Both Deardorff and Allison concluded that they needed to find some

4    place that had water.  See Deardorff Depo. 45:4-10; Allison Depo. 37:9-13.  In particular,

5    Deardorff testified, "my immediate thought was there was no way we can deal with this and I

6    knew this truck stop was right up the road.  We've got to get to somewhere where they've got

7    water because we can't deal with this . . . ."  Deardorff Depo. 45:4-9.  Allison testified that she

8    told her father that they needed help and to get to a safer place to get the horses out.  See Allison

9    Depo. 40:5-11.  When asked whether they considered letting the horses out when they had gotten

10   off of the exit, Allison testified that she had considered that option, but did not think that it was

11   advisable:  "I knew we needed to get the horses out of the trailer and in order to do that . . . there

12   was just two of us and we would have to turn them loose on the highway and I'm not sure – they

13   would have possibly run off or caused an accident.  I thought that the safest thing to do was get to

14   where there were more people to help hold the horses."  Id. at 40:12-23.

15        Deardorff and Allison have over 50 years of experience with horses between them, and

16   Deardorff had experience hauling horses.  See PUMF's 16, 17, 18, 23; Deardorff Dec. ¶¶ 3, 4.

17   The evidence is uncontradicted that they believed: (1) the fire was beyond them, (2) they needed

18   to get to a place where there was additional help and water, (3) it was not safe or advisable to

19   unload the horses at that point, and (4) they needed help in unloading the horses.  There is no

20   evidence to contradict this assessment.  In fact, the testimony of Leslie Pierce regarding the high

21   strung nature of these horses supports the assessment that help to unload the six show horses was

22   necessary.  While there were various options available to Deardorff in dealing with the afire

23   trailer, he chose the option of attempting to get to a place where he could obtain help, including a

24   place that had water.  Again, while the evidence at best might suggest negligence, it does not

25   show gross negligence.  No reasonable jury could find that Deardorff's decision to drive for help

26   instead of either unloading the horses or using the single bucket of water to try and extinguish the

27   flames shows "the want of scant care or an extreme departure from the standard of care."

28        Plaintiffs arguments rest on hypothetical options that Deardorff arguably should have

1    employed.  While these options were available to Deardorff, the evidence indicates that

2    Deardorff had concerns about stopping on I-5, and that both he and Allison believed they needed

3    to get help from somewhere in order to deal with the fire and the horses safely.  The evidence

4    shows that Deardorff chose to try and get help at the Petro station.  Deardorff and Allison have

5    considerable experience around horses and they believed that additional help was needed.  No

6    evidence has contradicted their assessment.  Further, once at the Petro station, Deardorff entered

7    the afire trailer in an attempt to save the horses.  See Deardorff Depo. 47:13-48:12.  Attempting

8    to get to a place to obtain help and then entering a trailer that is on fire in order to save the horses

9    demonstrates significant concern for the horses.  The evidence at best suggests negligence by

10   Deardorff, but no reasonable jury could conclude that Deardorff's actions show "the want of

11   scant care or an extreme departure from the standard of care."  As a matter of law, the evidence

12   presented does not indicate gross negligence.  See City of Santa Barbara, 41 Cal.4th at 766-67.

13

14   5.     Common Carrier

15        *Defendant's Argument*

16        Deardorff argues that he does not hold himself out to the public generally and

17   indifferently to transport horses.  Rather, on occasion he transports horses for clients and a select

18   group of other trainers, but the transportation is within the scope and in furtherance of his

19   boarding and training services.  As such, Deardorff argues that he is not a common carrier.

20        *Plaintiffs' Opposition*

21        Plaintiffs argue that the evidence establishes that Deardorff transports horses other than

22   those training at his stables.  See PUMF 22.  The Rate Schedule advertises and quotes the

23   standard prices for "local" and "other" transportation for both "training horses" and "non-training

24   horses."  Deardorff Stables advertises its services in the back of breed/trade publications and on

25   its website.  Finally, there is no limit to the number of horses that Deardorff cant take to a show.

26   Prior to the incident, he transported on average six horses to far away shows and fifteen horses to

27   local shows, and Deardorff owned four trailers at the time of the incident.  See PUMF 23.  Thus,

28   under California Civil Code § 2168, Deardorff is a common carrier.

*Legal Standard*

"Every one who offers to the public to carry persons, property or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168; Platzer v. Mammoth Mountain Ski Area, 104 Cal.App.4th 1253, 1257 (2002). "To be a common carrier, the entity merely must be of the character that members of the general public may, if they choose, avail themselves of it." Squaw Valley Ski Corp. v. Superior Court, 2 Cal.App.4th 1499, 1509-10 (1992). "The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently; and hence he is regarded, in some respects, as a public servant." People v. Duntley, 217 Cal. 150, 164 (1932). In contrast, private carriers are those who carry for hire, but do not come within the definition of a common carrier. Samuelson v. Public Utilities Com., 36 Cal.2d 722, 730 (1951); Duntley, 217 Cal. at 163-64. Private carriers "make no public profession that they will carry for all who apply, but who occasionally or upon the particular occasion undertake for compensation to carry the goods of others upon such terms as may be agreed upon." Webster v. Edgar, 3 Cal.App.4th 784, 788 (1992). Private carriers are not bound to carry for any reason unless they enter into a special agreement to do so. Samuelson, 36 Cal.2d at 730; Duntley, 217 Cal. at 163-64. Factors to consider in determining whether a defendant is a common carrier are whether : (1) the defendant maintains a regular place of business for the purpose of transportation; (2) the defendant advertises its services to the general public; and (3) the defendant charges standard fees for its services. See Gradus v. Hanson Aviation, 158 Cal.App.3d 1028, 1048 (1984); CACI § 901.

*Discussion*

Plaintiffs rely on three general assertions to argue that Deardorff is a common carrier as that term is defined by California Civil Code § 2168. The Court is not persuaded.

First, the Court sees little significance to the fact that Deardorff had four trailers (of unknown size, unknown age, and unknown frequency of use) or to the fact that he transported between 6 and 15 horses per show, depending on the distance from the stables. See PUMF 23. This evidence simply confirms that Deardorff transports horses for his clients. See Deardorff Dec. ¶ 18; Allison Depo. 92:18-93:6.

Second, it is true that Deardorff advertises his stables in trade publications and on the internet.  What Plaintiffs fail to describe is the nature of the advertising.  There is no evidence whatsoever that Deardorff advertises transportation services.  In fact, the evidence indicates that no transportation services are advertised.  Deardorff has declared, "Transportation services have never been mentioned anywhere on Deardorff Stable's website or in any advertisements published by me or Deardorff Stable, LLC."  Supplemental Deardorff Dec. ¶ 2.  General advertising about Deardorff Stable, without mention of transportation, does not indicate a common carrier.

Finally, Plaintiffs contend that Deardorff transports horses other than those at his stable.  PUMF 22 is relied upon to support this argument.  There is only one piece of evidence cited in support of PUMF 22 – the April 2008 Rate Schedule of Deardorff Stable.  As discussed above, the Rate Schedule does indeed have a section for "transportation" and includes set prices for training horses, non-training horses, local destinations and non-local destinations.  See Plaintiffs' Ex. A.  However, Plaintiffs have submitted no evidence about the Rate Schedule other than Rate Schedule itself.  Plaintiffs submitted no evidence regarding how the schedule is implemented, how or to whom the schedule is distributed, or what the term "non-training horse" means.  Despite Plaintiffs' failure to provide such evidence, Deardorff has filled the gap.  In his supplemental declaration, Deardorff declared:

> Deardorff Stable's Rate Schedule is not made available to the general public.  Deardorff Stable's Rate Schedule is only provided to individuals who express an interest in boarding their horse with me or [who] actually do board their horse with me.
>
> For example, some horses that boarded with me are broodmares that are being boarded for breeding purposes.  These horses are "Non-Training" horses that are being boarded by me as defined in Deardorff Stable's Rate Schedule.  "Non-Training" horses are not delivered to me by the general public to be transported from place to place for profit.

Supplemental Deardorff Dec. ¶¶ 3-4.  No evidence contradicts Deardorff's supplemental declaration.  Thus, it is apparent that the Rate Schedule is not given to the general public, rather it is given only to those who board their horses or who express an interest in boarding.  Further, "Non-Training" horses refer to broodmares at Deardorff's stable, they do not refer to horses delivered to Deardorff from the general  public to be transported.  Plaintiffs' characterization of,

1    and their conclusions drawn from, the Rate Schedule have no basis in fact.

2          The evidence establishes that Deardorff does not hold himself out to the public as a

3    transporter of horses, does not advertise to the public that he transports horses, and does not

4    maintain an established business whose purpose is to transport horses.  See DUMF 24; Deardorff

5    Dec. ¶ 18; Supplemental Deardorff Dec. ¶¶ 2-4.  The evidence is uncontradicted that Deardorff

6    performs limited transportation services for his clients, i.e. those who board their horses with

7    Deardorff, in furtherance of his boarding and training services.  See DUMF 24; Deardorff Dec. ¶

8    18; Supplemental Deardorff Dec. ¶ 3; Allison Depo. 92:18-93:6.  Based on the evidence

9    presented, no reasonable jury could find that Deardorff is a common carrier.  See Forsyth v. San

10   Joaquin Light & Power Corp., 208 Cal. 397, 405-06 (1929); Webster, 3 Cal.App.4th at 788;

11   CACI § 901.  Summary judgment on this issue is appropriate.

12

13   6.    Negligence & Breach of Contract

14         Defendant's Argument

15         Deardorff argues that there is no separate oral contract for the transport of the horses from

16   Oregon to Santa Barbara.  Because there is no such contract, there can be no breach.  Further, all

17   of his clients, including the Horse Owners in this case, agreed to assume the risk of loss to their

18   horses.  The contract that did exist between Deardorff and the Horse Owners obligated Deardorff

19   to board, train, transport, and help show each horse, but placed the risk of loss of a horse by death

20   directly on the owners.  That is why the Horse Owners bought mortality insurance for their

21   horses.  Plaintiffs cannot alter the terms of the agreement that exists between Deardorff and the

22   Horse Owners.

23         Plaintiffs' Opposition

24         Plaintiffs argue that the evidence shows that the Horse Owners decided to have their

25   horses shown in Santa Barbara, and Deardorff agreed to transport the horses for a fee.  Since

26   Deardorff failed to transport the horses back to Oregon, he breached the agreement.  With respect

27   to assumption of the risk, Plaintiffs argue that Deardorff's position is unsupported by law or fact.

28   First, Plaintiffs argue that there is no admissible evidence to support Deardorff's contention.

1   Second, only three of the six Horse Owners signed the waiver/release.  Third, there is no

2   evidence that the releases were still in effect.  Fourth, whether the Horse Owners had mortality

3   insurance has nothing to do with whether they assumed the risk of death.  Such an argument

4   makes no sense and is akin to arguing that a person who buys automobile or home owners

5   insurance assumes the risk of destruction of their home or car by third parties.  Finally, as

6   previously argued, the waiver does not absolve Deardorff from liability for either the death of the

7   horses or for gross negligence.

8        *Resolution*

9        The Court is not persuaded by Plaintiffs' five arguments against the assumption of the

10   risk.

11       First, although it is not possible to waive gross negligence, under Oregon law, a plaintiff

12   must demonstrate that enforcement of a waiver provision in the circumstances of his or her case

13   will, in fact, offend the pertinent public policy.  See Silva, 2008 U.S. Dist. LEXIS 55942 at *6-

14   *7; Harmon, 932 P.2d at 96.  For the reasons discussed above, the evidence submitted by

15   Plaintiffs fails to show gross negligence.

16       Second, no evidence suggests that the waivers or releases or assumptions of the risk are

17   no longer in force.  Deardorff's declaration and his wife Brooke Deardorff's declaration state that

18   all of the clients, as part of the boarding agreements, agreed to assume the risk of loss.  Since the

19   assumption is part of the boarding arrangements, the evidence suggests that the assumption

20   would remain in effect as long as the boarding arrangements remain in effect.  If Plaintiffs have

21   reason to believe that the waivers or assumptions of risk are no longer in effect, then it is their

22   obligation to present such evidence to the Court.  Plaintiffs failed to do so.

23       Third, the declarations of Deardorff and Brooke Deardorff state that all clients, including

24   the Horse Owners, agreed to assume the risk of loss.  The declarations do not state that only

25   clients who signed a written waiver agreed to assume the risk of loss of their horse.  There is no

26   evidence that the assumption of the risk was based only on written agreements.  Further,

27   Plaintiffs do not argue the legality of an oral assumption of the risk.  Three of the Horse Owners

28   in this case did not sign a written release.  If these three did not in fact agree to assume the risk of

loss, it would seem that, as a subrogation case, Plaintiffs easily could have obtained testimony or a declaration from these three Horse Owners that they did not agree to assume the risk of loss. Such testimony would clearly create a genuine disputed material fact.  However, such testimony is absent and there is no evidence that contradicts the Deardorffs' respective declarations.

Fourth, Brooke Deardorff declared that Deardorff Stable urged each of their clients to obtain mortality insurance because the clients agreed to assume the risk of loss.  See Brooke Deardorff Dec. ¶ 5.  That each of the insureds obtained mortality insurance on their horses is consistent with Brooke Deardorff's declaration.  There is no evidence regarding horse mortality insurance in general, or, more importantly, why the Horse Owners/insureds in this case purchased such insurance.  In the absence of evidence that actually contradicts Brooke Deardorff's declaration regarding mortality insurance, there is no material dispute.    The Court does not find Deardorff's position to be as far fetched as Plaintiffs contend.

Finally, Plaintiffs' contention that Deardorff's argument rests on inadmissible evidence is not well taken.  Deardorff's argument depends on Paragraph 4 of Brooke Deardorff's declaration and Paragraph 17 of his own declaration.  Both of those paragraphs indicate that Deardorff's clients agreed to take on the risk that their horse would become sick, injured, or die while the horse was being boarded by Deardorff.  See Deardorff Dec. ¶ 17; Brooke Deardorff Dec. ¶ 4. Plaintiffs object, without elaboration, that both of these paragraphs:  constitute improper opinion testimony, constitute a legal conclusion, misstate the evidence and documents which are the best evidence, are argument not fact, and are not relevant.  See Court's Docket Doc. No. 56-5 at p. 2; Doc. No. 56-6 at pp. 5-6.  However, the evidence is obviously relevant to the issue of assumption of the risk.  Further, it is not clear to the Court that the paragraphs are improper opinion testimony, are only argument, and constitute legal conclusions.  It is not clear what exactly Plaintiffs mean by these objections, and the paragraphs themselves simply purport to describe a term in an agreement.  Finally, assuming that Plaintiffs are making a "best evidence" objection under Rule of Evidence 1002,[13] there is no evidence that the written waivers were the only

---

[13]Federal Rule Evidence 1002 reads: "To prove the content of a writing . . . the original writing . . . is required, except as otherwise provided in these rules or by Act of Congress."

waivers or assumptions of risk.  The declarations of the Deardorffs simply state that all of their

clients agreed to assume the risk of harm or death of the their horses.  The declarations do not

limit their assertions to an agreement "in writing."  Plaintiffs simply assume that the boarding

agreements with Deardorff are in writing, or that the written waivers are the only assumptions of

risk.  The Court is aware of no testimony from the Horse Owners that shows that the boarding

agreements between Deardorff and the Horse Owners were in writing.  Plaintiffs make no

arguments regarding the existence of oral agreements (although that is what was allegedly

breached according to the SAC) or the propriety of oral waivers that are part of oral agreements.

Since Plaintiffs have not shown that there is a writing in issue, Rule 1002 by its own terms does

not apply.

        "Agreements to exonerate a party from liability or to limit the extent of the party's

liability for tortious conduct are not favorites of the courts but neither are they automatically

voided."  K-Lines, 541 P.2d at 1382; see also Mann, 785 P.2d at 1066.  Plaintiffs have presented

no evidence nor made persuasive arguments that there is no assumption of the risk by the Horse

Owners, nor have Plaintiffs argued or shown that such an assumption is unenforceable.  The

evidence shows that all of Deardorff's clients, including the Horse Owners, agreed to assume the

risk of death of their respective horses.  As subrogees, the assumption of the risk is enforceable

against Plaintiffs.  See Liberty Mut., 8 Cal.3d at 717; Interstate, 182 Cal.App.4th at 32; Great

Am., 165 Cal.App.4th at 451.  Summary judgment on these causes of action is appropriate.


7.      Conversion Claim

        *Defendant's Argument*

        Deardorff argues that he did not wrongfully exercise dominion over the horses either on

July 6, 2008, or at any other time.  The horses were in his possession under the express consent

and request of the Horse Owners.  Deardorff did not assume control or ownership over the horses

or apply the horses to his own use on July 6, 2008, and he never willfully interfered with the

Horse Owners' possessory interest without consent or lawful justification.  Further, there is a

complete lack of evidence that Deardorff intended or had the purpose of converting the Horses to

his own use or intended to prevent the Horse Owners from taking possession of the horses on July 6, 2008.  Finally, Plaintiffs claims are based on allegedly negligent conduct.  However, negligence in caring for goods is not an act of dominion over the goods such that a conversion occurs.  There is no valid conversion cause of action.

### Plaintiffs' Opposition

Plaintiffs argue that they can establish the elements of conversion.  There is no dispute over ownership of the horses.  Deardorff's "grossly negligent, wanton, and willful" actions led to the destruction of the horses and the disposition of the Horse Owners' property rights.  Finally, the horses were insured for over $200,000, which was paid to the Horse Owners and which represents the damages suffered as a result of Deardorff's conduct.  Further, conversion can still occur if a person who initially has consent to possess property subsequently acts wrongfully.  Deardorff acted wrongfully by taking no steps to either prevent the fire from starting in the first place or by saving the horses when they could have been saved.  "By killing the horses, Deardorff interfered with the Horse Owners' ownership of the horses . . . ."  Finally, while mere negligence may not constitute conversion, this case involves much more than mere negligence.

### Legal Standard

"Stated generally, conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein."  Zaslow v. Kroenert, 29 Cal.2d 541, 549 (1946); Collin v. American Empire Ins. Co., 21 Cal.App.4th 787, 812 (1994).  "Any act of dominion wrongfully exerted over the personal property of another inconsistent with the owner's rights thereto constitutes conversion."  Plummer v. Day/Eisenberg, LLP, 184 Cal. App.4th 38, 50 (2010).  A plaintiff must show that he did not consent to the defendant's exercise of dominion over the property, because there can be no conversion where "an owner either expressly or impliedly assents to or ratifies the taking, use, or disposition of his property."  Bank of N.Y. v. Fremont Gen. Corp., 523 F.3d 902, 914 (9th Cir. 2008); Farrington v. A. Teichert & Son, Inc., 59 Cal.App.2d 468, 474 (1943).  "Conversion is an intentional tort."  Don King Productions/Kingvision v. Ferreira, 950 F. Supp. 286, 290 (E.D. Cal. 1996); see Lackner v. North, 135 Cal.App.4th 1188, 1212 (2006).  "[N]either good nor bad faith, neither care nor

negligence, neither knowledge nor ignorance, are of the gist of the action [of conversion]." Gonzales v. Pers. Storage, 56 Cal.App.4th 464, 476-77 (1997).  Instead, the act of conversion "must be knowingly or intentionally done, but a wrongful intent is not necessary."  In re Peklar, 260 F.3d 1035, 1037 (9th Cir. 2001); Taylor v. Forte Hotels Int'l, 235 Cal.App.3d 1119, 1124 (1991).  A plaintiff must show that the defendant had "an intention or purpose to convert the goods and to exercise ownership over them, or to prevent the owner from taking possession of his property."  Zaslow, 29 Cal.2d at 550; Spates v. Dameron Hospital Assn., 114 Cal.App.4th 208, 222 (2003); Collin, 21 Cal.App.4th at 812; Simonian v. Patterson, 27 Cal.App.4th 773, 782 (1994).  Thus, if delivery by a bailee is impossible "because the goods have been lost or destroyed, either without fault on the part of the bailee or merely because of his negligence, there is no conversion.  Negligence in caring for the goods is not an act of dominion over them such as is necessary to make the bailee liable as a converter."  George v. Bekins Van & Storage Co., 33 Cal. 2d 834, 838 (1949); Gonzales 56 Cal.App.4th at 477; Simonian 27 Cal.App.4th at 781.

Therefore, in order to recover for conversion, a plaintiff must prove: (1) that he owned, or possessed, or had a right to possess property; (2) the defendant intentionally and substantially interfered with the plaintiff's property by taking possession of the chattel, by preventing the plaintiff from having access to the chattel, by destroying the chattel, or by refusing to return the chattel after the plaintiff demanded its return; (3) the plaintiff did not consent to the defendant's conduct; (4) that the plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing the plaintiff's harm.  See Judicial Council of California Civil Jury Instructions (2011 Ed.) – § 2100 ("CACI").

*Discussion*

Plaintiffs identify the death of the horses as the wrongful act of dominion at issue.  See Opposition at 15:8-10, 15:28-16:2.  The Court agrees and sees no other act that is inconsistent with the Horse Owners' rights of ownership in the horses.  See Zaslow, 29 Cal.2d at 549; Plummer, 184 Cal.App.4th 50.  The death of the horses constitutes "destruction" of property, and it is the death of the horses that prevents their return to the Horse Owners.  See CACI § 2101.  As such, the act of dominion at issue in this case is the death or destruction of the horses.

1    The Court cannot agree with Deardorff's first argument regarding consent.  There is no
2  genuine dispute that each of the Horse Owners gave their consent to Deardorff for him to possess
3  the horses, and that consent included the transit of the horses to and from the Santa Barbara
4  show.  See DUMF's 3, 5.  However, that is as far as the consent goes.  As stated above, the act of
5  dominion in this case is the death or destruction of the horses, it is not boarding or transporting
6  the horses to and from Santa Barbara.  In other words, Deardorff's consent arguments focus on
7  the wrong act.  As for the act of dominion at issue, there is no evidence that the Horse Owners
8  consented to the death of their horses.  See Bank of N.Y., 523 F.3d at 914; Farrington, 59
9  Cal.App.2d at 474.  Therefore, consent is not a defense to the destruction of the horses.  See id.

10    Nevertheless, that there is no consent for the death of the horses does not end the inquiry.
11  The wrongful act of dominion must be intentionally done.  In re Peklar, 260 F.3d at 1037.  That
12  is, Deardorff must have intentionally destroyed the horses.  See CACI § 2100.  While no "evil
13  intent" is necessary, there must be evidence that Deardorff had "an intention or purpose to
14  convert the goods and to exercise ownership over them, or to prevent the owner from taking
15  possession of his property."  Zaslow, 29 Cal.2d at 550; Spates, 114 Cal.App.4th at 222; Collin,
16  21 Cal.App.4th at 812; Simonian, 27 Cal.App.4th at 782.

17    Plaintiffs argue that Deardorff did not take steps to prevent the fire or to save the horses
18  when the fire first started and that Deardorff "killed the horses" as a result.  However, the
19  evidence relied upon fails to show the intent to cause the death/destruction of the horses.  At
20  most, Plaintiffs' arguments reflect alternative courses of action that Deardorff could have taken.
21  The evidence indicates that Deardorff did not know that there was a serious problem until he saw
22  smoke.  See Deardorff Depo. 40:20-41:4; Plaintiffs' Ex. N.  When Deardorff saw the smoke, he
23  stopped on I-5, and then saw "a lot of smoke" coming from the inside of the trailer.  See
24  Plaintiffs' Ex. N.  Deardorff then panicked and continued to drive in order to get the trailer to the
25  truck stop.  See id.  Deardorff and Allison both believed that they needed to get to the truck stop
26  in order to get help and get water.  See  Deardorff Depo. 43:9-45:10; Allison Depo. 37:8-17,
27  40:8-11.  This evidence indicates that a choice was made to try to get to the truck stop in order to
28  try to deal with the fire there.  It does not show the intent to destroy the horses.

1    In fact, Deardorff's lack of intent is especially evident when the other evidence in the

2    record is considered.  The evidence indicates that Deardorff cared for and trained these horses.

3    See DUMF 2.  He had just taken them to compete at the Santa Barbara Show.  See DUMF 3.

4    Deardorff has been training and/or taking care of numerous horses for almost 40 years.  See

5    DUMF 1, 2; PUMF 16.  None of the Horse Owners believed that Deardorff intentionally,

6    willfully, or wantonly harmed the horses, and several testified as to his love and care of the

7    horses.  Sally Nottage stated that Deardorff loved horses and treated the horses better than

8    people.  See Nottage Depo. 62:9, 69:5-13.  Leslie Pierce testified that Deardorff loved the horses

9    like family.  See Pierce Depo. 83:20-84:18.  Lisa Fulgaro testified that Deardorff treated the

10   horses in his possession like family.  See Fulgaro Depo. 62:18-64:17.  Finally, Deardorff entered

11   the trailer when the trailer was being consumed by fire in order to try and save the horses.  See

12   Deardorff Dec. ¶ 15; Deardorff Depo. 47:12-48:14.  The evidence indicates that Deardorff had

13   just unsnapped a horse and was trying to lead it out of the trailer when the horse collapsed.  See

14   Deardorff Depo. 47:12-48:14.  Deardorff suffered second degree burns on his hands, arms, and

15   face as a result of entering the afire trailer.  See Deardorff Dec. ¶ 15.

16   The evidence showing a lack of intent is also consistent with Plaintiffs' contention that

17   Deardorff's negligence caused the death of the horses.  See SAC at ¶¶ 34-35.  As discussed

18   above, California courts have held that the negligent destruction of personal property does not

19   constitute conversion.  "Negligence in caring for the goods is not an act of dominion over them

20   such as is necessary to make the bailee liable as a converter."  George, 33 Cal.2d at 838;

21   Gonzales 56 Cal.App.4th at 477; Simonian 27 Cal.App.4th at 781.  This rule has been applied in

22   a case where a warehouseman negligently caused a fire, and the fire destroyed the personal

23   property of others that were being stored in the warehouse.  See George, 33 Cal.2d at 838.

24   Despite the destruction of the property in George, there was no conversion because the

25   destruction was through negligence.  See id.  This is similar to the case at bar.

26   To avoid the effects of the rule that negligent destruction is not conversion, Plaintiffs cite

27   to Gonzales and argue that this rule only applies to "mere negligence," but this case involves

28   "gross negligence."  However, as discussed above, the evidence in this case does not support an

40

1   inference of gross negligence.  Also, gross negligence is still a species of negligence, and no

2   cases have been cited to the Court that equates gross negligence with intentional conduct for

3   purposes of conversion.  Albeit not in the context of a conversion claim, one court has noted that

4   grossly negligent conduct is not the same as intentional conduct.  See Robinson v. United States,

5   175 F.Supp.2d 1215, 1224 (E.D. Cal. 2001).

6         The evidence does not indicate an intent to destroy or cause the death of the horses.

7   There is no evidence that even remotely suggests that Deardorff intended to destroy or kill the

8   horses.  Plaintiffs' characterization of Deardorff's conduct as either negligent or grossly negligent

9   does not support conversion.  Summary judgment in favor of Deardorff on this cause of action is

10  appropriate.

11

12  8.     Trespass To Chattels Claim

13        *Defendants' Argument*

14        Deardorff argues that this claim is really for conversion, not trespass to chattels.  Trespass

15  to chattels is appropriate for when the interference with property is not sufficiently important to

16  be classified as conversion.  The tort is appropriate for minor interferences only.  The Plaintiffs

17  are alleging major interferences and are seeking to recover the full value of the horses, thus

18  Plaintiffs have only alleged claims for conversion.

19        *Plaintiffs' Opposition*

20        Plaintiffs argue that Deardorff's wanton and willful conduct not only resulted in damages

21  to the horses, but led to their avoidable death.  For the same reasons that Deardorff is liable for

22  conversion, he is liable for trespass to chattels.  There is no legal support for the position that

23  there cannot be trespass to chattels because there is more than a minor interference.  Plaintiffs

24  can establish every element of this claim.

25        *Legal Standard*

26        Like conversion, trespass to chattels is an intentional tort.  See Thames Shipyard &

27  Repair Co. v. United States, 350 F.3d 247, 253 n.4 (1st Cir. 2003); Thompson v. Forest, 614

28  A.2d 1064, 1067 (N.H. 1992); Herrmann v. Fossum, 270 N.W.2d 18, 20 (Minn. 1978); see also

1   Intel Corp. v. Hamidi, 30 Cal.4th 1342, 1350-51 (2003); CACI § 2101.  Similar to conversion, an

2   actionable trespass to chattels "lies where an intentional interference with the possession of

3   personal property has proximately caused injury."  Intel, 30 Cal.4th at 1350-51; Jamgotchian v.

4   Slender, 170 Cal.App.4th 1384, 1400 (2009).  However, trespass to chattels "allows recovery for

5   interferences with possession of personal property not sufficiently important to be classed as

6   conversion, and so to compel the defendant to pay the full value of the thing with which he has

7   interfered."  Jamgotchian, 170 Cal.App.4th at 1400; Thrifty-Tel, Inc. v. Bezenek, 46 Cal.App.4th

8   1559, 1566 (1996).  "In cases of interference with possession of personal property not amounting

9   to conversion, the owner has a cause of action for trespass . . . and may recover only the actual

10  damages suffered by reason of the impairment of the property or the loss of its use."  Intel, 30

11  Cal.4th at 1351; Zaslow v. Kroenert, 29 Cal.2d 541, 551 (1946); Jamgotchian 170 Cal.App.4th at

12  1400-01.  "Trespass remains as an occasional remedy for minor interferences, resulting in some

13  damage, but not sufficiently serious or sufficiently important to amount to the greater tort of

14  conversion."  Intel, 30 Cal.4th at 1351; Jamgotchian, 170 Cal.App.4th at 1401.

15      *Discussion*

16      Summary judgment on this cause of action is appropriate.

17      First, for the same reasons discussed above with respect to Plaintiffs' conversion claim,

18  there is no indication that Deardorff had the requisite intent required for the intentional tort of

19  trespass to chattels.

20      Second, Plaintiffs are impermissibly attempting to make an inapt tort fit the facts of this

21  case.  The interference at issue in this case is the death or destruction of the horses.  California

22  recognizes that trespass to chattels is available for an interference with property that is "minor"

23  and not "sufficiently important" to be classified as a conversion.  See Intel, 30 Cal.4th at 1351;

24  Zaslow, 29 Cal.2d at 551; Jamgotchian, 170 Cal.App.4th at 1400-01.  Under no reasonable

25  analysis can the destruction/death of the horses in this case be classified as "minor."  Also,

26  Plaintiffs do not contest that they are seeking the full value of the horses.  The full value of the

27  personal property with which there is interference is not the proper measure of damages under

28  trespass to chattels.  See Jamgotchian, 170 Cal.App.4th at 1400; Thrifty-Tel, 46 Cal.App.4th at

1566; Prosser & Keeton On Torts, § 14 at 85-86 (5th Ed. 1984).  Full value of the property is a

measure of damages for conversion.  See Intel, 30 Cal.4th at 1351; Irwin v. McDowell, 91 Cal.

119, 122 (1891).  Because Plaintiffs have identified no other damages/remedy other than the full

value of the horses, Plaintiffs are seeking a remedy not available under trespass to chattels.  This

shows the invalidity of Plaintiffs' claim.

Trespass to chattels does not fit the facts of this case.  Summary judgment in favor of

Deardorff is appropriate.


9.    Additional Motions

After Deardorff filed this motion for summary judgment, he later filed a motion to

transfer venue under 28 U.S.C. § 1404.  Also, Plaintiffs prematurely filed several motions in

limine.  It is unnecessary to rule on these motions because the Court is granting Deardorff's

motion in its entirety.  All of the motions that were filed after Deardorff's summary judgment

motion will be denied as moot.


**CONCLUSION**

Deardorff moves for summary judgment on all claims alleged against him, as well as on

the issue of whether he is a common carrier.

With respect to the statute of limitations, the declaration of Deardorff and the testimony

of the Horse Owners, show that the transportation services offered by Deardorff are tied to the

boarding services that Deardorff provides.  The transportation of the horses in this case was part

of the Horse Owners' boarding relationship and agreement with Deardorff, which included the

option of attending and showing horses at horse shows.  There was no separate hauling

agreement.  Deardorff was in the process of boarding the horses at the time of incident.  That

Deardorff may have also been transporting the horses does not change the nature of his boarding

relationship with the Horse Owners, and does not mean that Deardorff was not in the course of

boarding the horses.  Because the loss of the horses occurred in the course of boarding, the one

year statute of limitations in California Code of Civil Procedure § 340(c) applies.  Further,

43

because the facts and allegations show that the horses' deaths arose out of the allegedly neglectful conduct of Deardorff, all of Plaintiffs' claims are subject to § 340(c).  Under the § 340(c) limitations period, Plaintiffs had until July 2009 in which to file suit.  Because suit was filed on December 31, 2009, all of Plaintiffs claims are time barred, and summary judgment in favor of Deardorff is appropriate.

With respect to the written waivers, Diamond may not pursue its claims because their insureds waived all claims that arose out of the neglect of Deardorff, including the death of the horses.  Diamond is bound by the admissions of Leslie Pierce and Karen Lachman, and those admission are directly contrary to Diamond's arguments regarding the waivers.  Further, although the waivers would not apply to claims of gross negligence, the evidence presented does not show gross negligence.  Given the conduct, experience, and assessment/thought process of Deardorff and Allison, Deardorff's decision to try to get off of I-5 and go to a truck stop for help, especially when combined his entrance into the burning trailer to save the horses, does not show the want of even scant care or an extreme departure from the standard of care."  No reasonable jury could find otherwise.  Summary judgment in favor of Deardorff on the waiver issue is appropriate.

With respect to the issue of common carrier, there is no evidence that supports the conclusion that Deardorff is a common carrier.  Deardorff does not hold himself out to the public to transport horses, he does not advertise transportation services, he has no business established for the purpose of transporting horses, and he does not distribute the Rate Schedule to the public.  Summary judgment in favor of Deardorff on this issue is appropriate.

With respect to Plaintiffs' negligence and breach of contract claims, no genuine dispute has been created by the evidence and argument of Plaintiffs regarding assumption of the risk.  Again, the evidence does not show gross negligence.  Because each of Deardorff's clients, including the Horse Owners, assumes the risk of sickness, injury, or death of their horse, Plaintiffs' negligence and breach of contract claims fail.  Summary judgment in favor of Deardorff on these claims is appropriate.

With respect to Plaintiffs' claim for conversion, that claim fails because there is no evidence that Deardorff intended to destroy the horses or to interfere with the Horse Owners'

right to possess the horses.  At best, there is negligent conduct, and negligent conduct will not support a claim for conversion.  Summary judgment in favor of Deardorff on this claim is appropriate.

With respect to Plaintiffs' claim for trespass to chattels, this claim fails because there is no evidence that suggests that Deardorff had the intent to interfere with the Horse Owners' personal possession of the horses.  Further, the facts of this case and the relief requested show that this tort has no application.  Summary judgment in favor of Deardorff is appropriate.

Finally, after filing this motion, Deardorff filed a motion to transfer venue.  Plaintiffs also filed numerous motions in limine.  In light of the Court's ruling on the summary judgment motion, these additional motions will be denied as moot.

Accordingly, IT IS HEREBY ORDERED that:

1.      Defendant's motion for summary judgment is GRANTED in its entirety;

2.      Plaintiffs' motions in limine are DENIED as moot;

3.      Defendant's motion for change of venue is DENIED as moot; and

4.      The Clerk is directed to enter judgment in favor of Defendant and to CLOSE this case.


IT IS SO ORDERED.

Dated:   April 14, 2011

CHIEF UNITED STATES DISTRICT JUDGE

45